# The Commonwealth of Pennsylvania *ex rel.* James Buchanan Crosse *versus* John S. Halloway, Warden of the Eastern Penitentiary.

*Criminal Law.—Pardon not valid until Delivery.— Void on account of Fraud in obtaining it.*

1. A pardon is an act of mere grace, and is not founded on any preliminary steps that furnish legal merits or a legal title.

2. The *intention* of the executive to grant a pardon can have no legal force until carried into completed act. The completed act is the charter of pardon *delivered*.

3. By usage, the delivery of a pardon to the warden of a prison is *primâ facie* equivalent to delivery, or is a constructive delivery to the prisoner, but it may be proved no delivery by circumstances that are inconsistent with the intention to deliver it.

4. A pardon procured by false and forged representations and papers is void.

5. Where on the faith of a forged letter from the War Department, asking for a pardon, and stating that the prisoner was wanted for secret public service, a pardon was executed by the governor and put into the hands of the United States marshal, to be delivered to the prisoner on his performance of the service, and by the marshal delivered to the warden of the prison in order to obtain the release of the prisoner, *Held*, that this was not a delivery to the prisoner, notwithstanding the custom in Pennsylvania to deliver pardons to the warden of the prison to keep as his voucher.

6. Even had this been a delivery, the fraud in obtaining the pardon would have avoided it, although it was not shown that the prisoner had any hand in perpetrating the fraud.

7. Whether the statute 27 Edw. 3, c. 2, is in force in Pennsylvania, *quære?*

Sur Habeas Corpus to the warden of the Eastern Penitentiary.·

At June Term 1860, of the Court of Quarter Sessions
of Philadelphia county, J. Buchanan Crosse was indicted for
forgery, tried, and duly convicted, and on the 18th of August
1860 sentenced to pay a fine of one cent, and undergo an im-
prisonment in separate or solitary confinement, at labour, in
the state penitentiary for the Eastern District, for the term
of five years, to be fed, clothed, &c., as the law directs, pay the
costs of prosecution, and stand committed, &c.; in pursuance of
which sentence he was delivered into the custody of the warden
of the penitentiary. About the 1st of June 1862, the following

[Commonwealth v. Halloway.]

communication was received by William Millward, United States Marshal, at Philadelphia :—

"War Department, Washington City, D. C.,
"June 1st 1862.
"William Millward, Esq., U. S. Marshal, Philadelphia, Pa.

"Sir,—The secretary of war directs me to advise you, after receipt of a despatch from the head-quarters of the army to this department, with an urgent request that an immediate effort be made to send to that point the somewhat notorious forger, J. Buchanan Crosse, now an inmate of your state prison, and to instruct you to proceed to Harrisburg, for the purpose of making a personal application to the executive for his release, and to bring him to this city with the least possible delay. You will please communicate the contents of this note to United States District Attorney Coffey, Collector Thomas, and Postmaster Walborn, and request them to append their names, with your own, to the petition enclosed, which, with a copy of record of sentence, it is presumed will be sufficient, as this department has addressed a note to Governor Curtin, requesting his favourable consideration of the same.

"Crosse is to be sent over the lines for a specific purpose with a telegraph operator, now in waiting at head-quarters, and as the service will be attended with much personal peril, the secretary of war is desirous that no publicity be given to the fact that the application for his release emanated from this department, the knowledge of which, in case of accident, would be fatal to him, and defeat the purposes of his mission.

"You will therefore observe, at a glance, the propriety of avoiding any explanations whatever to the local authorities and prison officials, or even to Crosse himself, until he reaches this point.

"Your prompt attention will be duly recognised by this department.

"Very respectfully, your obedient servant,
"P. H. WATSON, Assistant Secretary of War."

About the same time the following communication was received by his Excellency Governor Curtin, at Harrisburg :—

"War Department, Washington City, D. C.,
"June 1st 1862.
"To His Excellency, Gov. Andrew G. Curtin, Harrisburg, Pa.

"Sir,—The secretary of war directs me to inform your excellency of the receipt of a despatch from the headquarters of the army, urgently desiring this department to procure the release of one J. Buchanan Crosse, an inmate of your state prison, at Philadelphia, and to forward him to that point at once.

"Instructions have this day been forwarded to the U. S. mar-

[Commonwealth *v.* Halloway.]

shal, at Philadelphia, to personally wait upon your excellency, with a formal application for his enlargement.

" The secretary of war feels very well assured that your excellency's well-known zeal in our common cause will lead to a cheerful compliance.

" Crosse is to be sent over the lines for a specific purpose, in connection with his brother and a company of telegraph operators, now in waiting at head-quarters, where his *peculiar talents* will render a valuable service.

" The secretary of war presumes that your excellency will see the propriety of withholding from the public the fact that this department have applied for his release.

" Trusting that your official clemency will enable Crosse to reach us at an early hour,

" I am, with high consideration, your excellency's humble servant,

P. H. WATSON, Assist. Sec'ry. War."

In pursuance of these apparently official directions, the following letter was addressed to the governor :—

" To His Excellency, Gov. Andrew G. Curtin, Harrisburg, Pa.

" Sir,—The undersigned, citizens of Pennsylvania, respectfully solicit the pardon of J. Buchanan Crosse, now in confinement in the Eastern State Penitentiary, at Philadelphia, and represent to your excellency that the said Crosse was convicted of the crime of forgery, in the Quarter Sessions sitting in and for the county of Philadelphia, and sentenced on the          day of          in the year of our Lord 186   to          years' separate and solitary confinement, at labour, in the said penitentiary.

" Your petitioners further represent that good cause exists why the said Crosse should be released, and that they are induced to make this application on the grounds of public expediency and public justice.

" Respectfully, &c.,

" GEO. A. COFFEY, U. S. Attorney for E. D. of Pa.
" WM. B. THOMAS, Collector.
" WILLIAM MILLWARD, U. S. Marshal."

On the 3d of June 1862, a pardon, under the great seal of the Commonwealth, was issued, reciting the conviction and sentence of Crosse, the application for his pardon, but omitting the reasons for granting it, as requested in the letter of the assistant secretary, which pardon was placed in the hands of Marshal Millward, by whom it was delivered to Thomas Halloway, warden of the penitentiary.

The following extracts from the warden's journal (read under exception), exhibits the action that was then taken in the premises :—

[Commonwealth *v.* Halloway.]

" 1862 June 4th.—Delivered into the custody of U. S. Marshal Millward, under authority of a pardon from his excellency A G. Curtin, governor of the state, prisoner No. 4304, J. Buchanan Crosse (white), who has been here one year and nearly ten months.

" June 5th.—Prisoner No. 4304, J. Buchanan Crosse, was returned to custody by Marshal Millward, about six o'clock this evening, by an order from Hon. Eli Slifer, secretary of the Commonwealth, recalling the pardon, and directing him to be again returned to the penitentiary, it appearing that the pardon had been obtained upon forged representations. The prisoner had never been out of custody, nor had any official notice of his pardon."

On the 12th of December 1862, the prisoner, by his counsel, *Edward H. Weil,* presented a petition to Woodward, J., reciting his conviction, sentence, pardon, and recommitment as above stated, complaining that he is unlawfully detained in violation of an unconditional pardon, and praying for a writ of *habeas corpus,* &c., which writ was awarded, directed to the warden, returnable on the 3d of January next, at 10 o'clock A. M.

To this writ the warden returned before the court in banc that he held the prisoner by virtue of the commitment issued out of the Quarter Sessions of Philadelphia, and proceeding as follows:

" Respondent further says that true it is, that the Governor of the Commonwealth of Pennsylvania, on the 3d day of June, A. D. 1862, made out a pardon for the said J. Buchanan Crosse, which pardon was never delivered to said Crosse, but was placed in the hands of respondent on the 4th day of June, A. D. 1862, by William Millward, Esq., United States Marshal for the Eastern District of Pennsylvania. Respondent thereupon allowed said Crosse to be taken away by and in the custody of said William Millward, Esq.

" That said Millward, on the 5th day of June, A. D. 1862, returned the said Crosse to the custody of the respondent.

" That said Crosse remained in the custody of Marshal Millward until returned to the custody of respondent."

The return further set forth that the said pardon had been procured by certain forged letters from the assistant secretary of war, copies of which were annexed, that the said pardon was therefore void, and that the said Crosse was detained upon the original commitment.

Immediately upon the reading of this return, *Edward H. Weil,* Esq., on behalf of the relator, filed a traverse to that part of it which asserted that the pardon had not been delivered, and on the issue thus formed, several witnesses were examined at the bar of the court.

[Commonwealth *v.* Halloway.]

Eli Slifer, Esq., secretary of the Commonwealth, was first called, and testified that some time early in June the governor received the letter above given, purporting to be from the assistant secretary of war, asking for the pardon of Crosse.

That the next day United States Marshal Millward called and presented the recommendation for the pardon, signed by Collector Thomas and U. S. District-Attorney Coffee, and stating that he was needed by the government for some special service. On this letter the pardon was granted. The great seal of the state was attached. It was distinctly understood between the marshal and the secretary, however, that the pardon was not to be handed to Crosse until he had performed the service required of him by the government.

The pardon was never enrolled, and was granted entirely on the letter to Governor Curtin from the secretary of war.

The secretary was first informed of the forgery the day after the pardon was issued, by a despatch from Marshal Millward, saying that it was based on forged papers. He immediately telegraphed to the marshal to return the prisoner to the penitentiary, and return the pardon to him (the secretary).

Mr. Millward testified that he presented the pardon to the warden, who thereupon permitted him to take Crosse away ; that on going to the cell he asked Crosse if he would accompany him to Washington, adding that it might result to his benefit. To which Crosse replied, " Yes, if it is not for another trial ;" that he was told it was not for that purpose, when he replied, " Yes, I will go, I am pardoned," which the witness denied. The.pardon was handed to the warden, with the express understanding that it was not to be made known to Crosse, and that no one in the prison was to be informed of his removal.

Mr. Halloway was then examined, and testified to the calling of Marshal Millward at the penitentiary for Crosse, and the details of that interview, substantially the same as testified to by the marshal. In addition, however, he stated that it was his custom, upon the discharge of a prisoner under a pardon, to exhibit it to him, and almost invariably to read it to the prisoner, to show upon what grounds his discharge was made ; but, in reply to a question from Judge Woodward, he added that he would not have discharged him on a verbal statement of the marshal, and that he only discharged him on the exhibition of the pardon, and on no other ground. In reply to a question from Judge Lowrie, the witness stated that he usually went to the prisoner and stated to him the fact of his pardon, had him dressed and brought to the office, where the pardon was exhibited and read. No other evidence than the ·pardon is ever required. The pardon is usually retained.

Crosse was taken to Washington by the marshal and Deputy

[Commonwealth v. Halloway.]

Marshal Jenkins, and conveyed immediately to Secretary Stanton's office.

An explanation then ensued, the assistant secretary was sent for, and the letter purporting to come from him to the marshal was shown him. He thought it was in his handwriting, but had no recollection of writing such a letter. The franked envelope in which it was contained was then shown, and the forgery was detected by the frank being on a different side of the envelope from that on which it was customary to write it. It was franked as was the custom under Secretary Cameron.

The marshal then had Crosse locked up for the night, and the next day brought him back to Philadelphia, and redelivered him to the warden of the prison, as before stated.

The case was argued by *E. H. Weil*, for the relator.—Where the king grants more or other things than he intends, but is not deceived by any matter suggested by the grantee, but is only mistaken in his own surmises, such grant is good: Viner's Abr. 17, 100; 1 Strobhart 162; 2 Whart. 453; 3 Johns. Cas. 333; 6 Watts 338; 8 How. Pract. Rep. N. Y. 316; 16 Peters 119; Shepherd's Touchstone 58; 5 Barn. & Cress. 692; 11 East 623; 5 Co. 49; 4 Bl. Com. 402; 5 English 224; 18 How. 307; 1 Cranch 137; 9 Casey 283; Hawk. P. C. 532, 538; Foster's Crown Law 284; 1 Chit. Cr. Law 765; Cowp. 334; 1 Leach 118; Ahl's Case, 7 Wright 53.

Hon. *W. M. Meredith*, Attorney-General (with whom was *William B. Mann*, District Attorney), for the respondent.—By the common law, every charter or patent issued on false suggestion was voidable by the Crown, and could be repealed on *scire facias*. This applied to charters of pardon: Howard's Case, T. Raym. 13.

The law presumes that the charter was granted by reason of the suggestions made by those who applied for it, and that these suggestions directly or indirectly came from the grantee, and these are *præsumptiones juris et de jure*, and cannot be contradicted. In other words, a grant obtained by false suggestions from the public authority, may for that reason be avoided, whether the false suggestions were or were not in fact made by the party benefited by the grant.

Thus the law would stand on a *scire facias*. But that being found an insufficient remedy, as the criminal would have an opportunity to escape before a trial could be had, the statute of 27 Ed. 3, c. 2, was passed, not to alter the law, but to give a necessary jurisdiction in a speedier form.

That statute contains but two new provisions. The first is directory, viz., that henceforth the charter of pardon shall set

[Commonwealth *v.* Halloway.]

forth the suggestion, where it shall be granted at "any man's suggestion." The second provision is, that if the justices before whom such charter is alleged shall find the suggestions to be untrue, they shall disallow the charter.

This act, like the common law, does not require that the making of the false suggestion shall be traced to the party; it expressly speaks of "any man's" suggestion. Nor does it make it the duty of the justices to inquire into the truth of only the suggestions recited in the pardon, for it commands such inquiry to be made "as well of charters granted before this time, as of charters which shall be granted in time to come." Before the passage of the act, there had been no direction that the suggestions should be recited in the charter. As this statute did not alter the law, but merely gave a more effectual form of proceedings necessary to prevent great public evils, and as it is entirely suitable for us, in every respect, there can be no doubt but it is in force. The cases cited on the argument show that statutes have been so held to be, which were never actually enforced (no occasion having arisen) till a very recent period. In fact, the Act of 1722 gave to the Supreme Court all the powers and jurisdiction of the King's Bench and Common Pleas, and this was one of them. The statute in question created no new law on the subject, but merely gave jurisdiction in a new form. This statute may therefore be considered as expressly adopted by our Act of 1722.

*Weil*, in reply.—The statute Ed. 3 is not reported as in force in Pennsylvania. If it ever was in force, it is repealed by the constitution, which does not require the governor to give his reasons for a pardon. Parol evidence cannot be given to vary or control the pardon. The inducement alleged in the pardon is the petition from the marshal and others. There is nothing about the letters. The false suggestions must appear on the face of the pardon, and they must be shown to proceed from the grantee.

The opinion of the court was delivered by

LOWRIE, C. J.—There are charters or patents for new inventions, for lands, for grants of corporate privileges, and as commissioners of public affairs, as well as those of pardons; and though all these have a strong likeness as to their form, and to the source whence they immediately proceed, yet they have also some marked points of unlikeness that warn us to be cautious about confounding the rules that belong to any one kind with those of another. We notice here only the distinction that is important for this case. With us, those that relate to new inventions, to lands, to corporate privileges, and to offices, are usually

only the last step in the process by which certain rights become completely vested; and when all the preliminary steps are regular and complete, this last step becomes a mere ministerial duty definitely prescribed by law, and the claimant has a right to demand that it shall be taken because he has performed all the conditions upon which the law has made his title to it to depend. Then the appropriate charter becomes a vested right, and the withholding of it a civil injury, which may usually be redressed in some form of law; and in some cases the matter may be treated as if the charter had been actually delivered, though the fact be otherwise. These instances bear a strong analogy to sales of land where all the terms have been performed by the purchaser, and the conveyance alone is wanting, or where a deed has been delivered in *escrow*, and all the conditions of final delivery have been performed. The equity of the law often dispenses with such final acts of investiture of title as are in their nature only formal.

But charters of pardon are entirely different from these, in the conditions on which they depend; for (not to speak of those which are issued in pursuance of promises, by proclamation or otherwise, of executive clemency) they are forwarded on mere grace, and not at all on any preliminary steps that furnish legal merits or a legal title to them. The *intention* of the executive to grant a pardon can have no legal force until carried into completed act. And his instructions to his proper officers, and their work in pursuance of his instructions, are only the means by which he embodies his intentions into the completed act, and have no force out of the executive sphere until thus completed; though the courts may, when the intention is satisfactorily shown, suspend further proceedings in expectation of the actual pardon, as has been sometimes done in England. The completed act is the charter of pardon and *delivered*. This is the one and only step that gives title to a pardon. Until delivery, all that may have been done is mere matter of intended favour, and may be cancelled to accord with a change of intention.

Was this pardon delivered? In the strictest sense, no; for the grantee of it never saw it or had it in his possession. But in a less strict sense, yes; for it was delivered to the warden of the prison, and this has been with us usually treated as a delivery, the charter of pardon having come, by a somewhat loose practice, to be considered as the warden or keeper of the prison's voucher for the discharge of the prisoner, rather than what it truly is, the prisoner's title to the pardon of his offence, and to his discharge from all the consequences of his conviction.

We say this practice is somewhat loose, because it takes away from the grantee his title to his pardon, and throws upon the warden the responsibility of judging of its sufficiency. We do

[Commonwealth *v.* Halloway.]

not condemn the practice, because ordinarily it works very well, and because the strict ancient practice that required the prisoner to sue out a *habeas corpus* from the Court of King's Bench (Supreme Court here), in order that he might appear and plead his pardon, and have it allowed there, would be very inconvenient with us.   If this strict practice were pursued, the prisoner could not get his discharge without the judgment of the court on the sufficiency of his pardon, and it seems very proper that he should gain no advantage by this loose practice, beyond exemption from the inconvenience of the stricter practice.

But we have not fully answered the question, was his pardon delivered?   We think that by usage its delivery to the warden is *primâ facie* equivalent to delivery, or is a constructive delivery to the prisoner; but it is open to be proved no delivery by showing circumstances that are inconsistent with the intention to deliver it.   The circumstances shown here are, that the governor issued the pardon as a means of putting the prisoner into the hands of the United States marshal, and through him into the hands of the war department at Washington, for the performance of some service to that department; that it was delivered to the marshal to be used for that purpose, and not to be used as a pardon unless the prisoner would consent to go for that purpose, and was not enrolled; that the prisoner was not informed of his pardon, but consented to go to Washington, and was taken there by the marshal, who there learned that the governor and he had been imposed upon by forged letters as from the war department, and no service was wanted from him, and the prisoner was thereupon brought back by the marshal on the next day without having been out of his custody, and immediately returned to his cell in the penitentiary; and the entry on the warden's books is in accordance with this, that he was delivered into the custody of the marshal under the authority of the pardon, and on the next day returned.   By order of the secretary of the commonwealth the pardon was sent back to him.

We have already found a constructive delivery, independent of circumstances; do the circumstances just related change the result, or forbid such a finding?   We think they do.   The intention of the governor was to accommodate the war department, by allowing it to obtain the services of the prisoner, and the intention to pardon was only an incident of this, and dependent upon it.   There was no intention to pardon except for the purpose of meeting a supposed request of the war department for the services of the prisoner, and when this turns out to be entirely without foundation, there can be no reason for attributing any efficiency to the subordinate and dependent intention.   Judicial constructions, like judicial fictions, are designed to further and not to frustrate equity and justice, and can never prevail

[Commonwealth *v.* Halloway.]

against manifest right and justice, and the prisoner has no sort of merits in law or equity on which to base a claim that this pardon was constructively delivered or constructively vests in him any right. A delivery of goods to a carrier is usually a constructive delivery to the consignee, but not so if it be induced . by mistake or fraud; at least not irrevocably so.

True, the prisoner was taken out of the penitentiary by means of the pardon; but he was not discharged under it, else he would have gone free, and not have been brought back. He was not intended to be discharged, except to enter upon the expected service, and he has no equity to claim that the mistaken delivery to the marshal shall stand for a discharge on a complete and valid pardon. The most that could be made of it would be that this was the application of the form of a pardon to an unauthorized purpose, and that his delivery to the marshal was a voluntary or involuntary escape, neither of which is equivalent to a pardon.

We think, also, that this pardon is void because of the false and forged representations and papers that were used in procuring it from the governor. We do not feel entirely prepared to assent to that part of the argument of the attorney-general which would base this conclusion on the statute 27 Ed. 3, c. 2, 1 Ruff 273, because we are not entirely satisfied that that statute has been received as part of our law. We prefer leaving that question open for future consideration. But we think the principles of the common law demand this conclusion, and they have a rather wider extent than the provisions of this statute.

By the statute a pardon is to be disallowed by the judges of their own motion, if any of the suggestions contained in it appear to be false; but by the common law all charters and patents may be avoided if based on any false suggestion, whether the suggestions be contained in them or not. This question, however, can be raised only at the instance of the attorney-general, as the law officer of the executive, for it would be quite indecent that any other person should raise it, unless under some carefully prepared statutory regulation. Such a question may be raised by a *scire facias* to repeal the charter; but it may also be raised on *habeas corpus* issued to allow the prisoner to plead his pardon; for the commonwealth is a party to that proceeding, and the attorney-general may appear and answer the plea, by showing the false suggestions on which the pardon was obtained.

Here the falsity of the suggestion is very plain. True, there is no falsity in the suggestion specified in the pardon. But this is fully accounted for. The suggestion that is recited contains only the general reason of public expediency, because the special grounds of that expediency were to be kept secret. The forged letters to the governor and marshal suggested that the prisoner

[Commonwealth *v.* Halloway.]

was needed for some secret, public service, and that, as this could not be recited in the pardon, an application should be made that should specify only general considerations, so that the pardon might be founded on that without naming the letters.

We do not feel the force of the objection that the prisoner does not appear to have had any hand in the forging of the letters. He can claim nothing as a favour that is founded on the fraud of his friends, so as to prevent the frustration of the fraud. Any person may reclaim the rights out of which he has been cheated, until they come into the hands of a third person, who is a *bonâ fide* purchaser for value, without notice of the fraud. And so may the commonwealth. The prisoner has no merit of his own that is sufficient to override the fraud of his friends in this matter. When he shows that he has, he will, no doubt, get a new and honest pardon. He has no better title to this pardon than a consignee of goods would have after the goods had been stopped in transitu, on the discovery that the sale and delivery had been procured by letters forged by the friends of the consignee.

The prisoner is remanded.