## Adkins v. Commonwealth.

(Decided December 20, 1929.)

J. B. ADAMSON for appellant.

J. W. CAMMACK, Attorney General, E. POE HARRIS, and CLIFFORD E. SMITH, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming.

The appellant, S. Green Adkins, was held by the examining court under bail of $25,000 to answer to the Boyd county grand jury on a charge of murder. Before an indictment was returned against him, on December 12, 1927, the day before his term of office expired, Governor William J. Fields issued an unconditional pardon to Adkins for this crime. A few days thereafter this suit

in equity was filed in the Boyd circuit court by the Commonwealth of Kentucky, on relation of Hon. Frank E. Daugherty, Attorney General of the State, and Hon. Watt M. Prichard, Commonwealth's Attorney for the district in which that county is located, alleging in an apt pleading that the pardon had been obtained through fraud and misrepresentation perpetrated upon the Commonwealth of Kentucky and the Governor thereof, and praying that it be held void and of no effect; and that the defendant be enjoined from claiming or setting up any rights, defenses, privileges, or advantages whatsoever under it. Later the successors in office of the relators were substituted. Mr. Fields, although no longer the Governor, also became a party plaintiff. The demurrer to the petition being overruled, the defendant denied by answer the allegations of the fraudulent acts, and affirmatively pleaded that the Governor had not relied on the alleged fraudulent representations but had had before him numerous oral and written statements which induced him to grant the pardon.

The trial court sustained the prayer of the petition and held the pardon to be void. On this appeal it is argued, first, that the courts have no jurisdiction to entertain an action to cancel a pardon on the ground of fraud in its procurement, as such would be usurpation by the judicial department of the functions of the executive department, for the granting of a pardon is confided by the Constitution exclusively in the executive and cannot be called in question by the judiciary; and, second, that the Governor was in possession of all the facts gathered from sources and documents filed with him other than the fraudulent or forged petition, and that neither he nor the commonwealth could rely upon that alleged fraud to avoid the pardon.

We shall dispose of the points in the inverse order of their presentation.

1. A young man named Virgil Goodman had been charged with the appellant as an accessory to the crime of murder. The Governor's sister had interceded in his behalf, and there had been several letters and affidavits filed with him purporting to disclose the facts of the homicide and the conditions surrounding the parties. These letters were genuine and some of them recommended the extension of clemency to both defendants. There was also filed with him in behalf of Goodman a transcript

of the evidence heard on the joint examining trial. The appellant, Adkins, some months before had been convicted in the police court of Ashland on the charge of possessing a small quantity of intoxicating liquor, and, conceiving that the mayor had power to relieve him of the penalties inflicted, he had had drafted a petition to the mayor seeking that end. This was presented to and signed by 60 or more influential citizens of Ashland, both public and private. After having been held under bond on the charge of murder (committed after the petition had been procured), the appellant had drawn a strong and persuasive petition to the Governor for a pardon for the murder with which he was charged and substituted this paper for that addressed to the mayor of Ashland, attaching to it the sheets bearing the signatures of those citizens. This was presented to the Governor in support of his application for a pardon. The Governor knew practically every person whose name was thus presented, knew the signatures of some of them, and many of them were his lifelong friends. He testified on the trial of this suit, ''I highly esteemed not only their representations of fact, but also their conception of the duties and obligations of the Executive,'' and stated positively that he would never have granted the pardon to Adkins but for his reliance on the representations contained in this forged petition, although he would have granted the pardon to Goodman without it.

Appellant relies on the familiar rule that one cannot secure redress or relief on the ground of fraud which he knew to be such or a representation which he knew to be false. That law is not applicable, for although the circumstances surrounding the homicide, as stated in this petition, were presented to the Governor by other means, the recommendations of these influential and trustworthy citizens were not actually made to him. He testified that he relied on their good judgment in the matter as thus fraudulently expressed and was deceived by this forgery. This vicious fraud perpetrated upon the commonwealth and her Governor by Adkins was the real and controlling factor causing the issuance of this pardon. It would never have been granted but for it, and the case must be determined upon that premise.

2. An able argument is presented in behalf of appellant that the action of the Governor in granting the pardon is final and cannot be brought into question by the

courts because of the constitutional prohibition of encroachment upon the prerogatives of the executive department. All will agree that as an abstract proposition of constitutional law that is correct. It is, however, questioned when applied to a pardon secured through fraud.

When our form of government was established, history was replete with fallen dynasties and wrecked governments founded on power. So our political forefathers planted the new government upon the fundamental principle of control, with three co-ordinate branches, of delineated powers, forming the foundation of the marvelous structure of checks and balances. The states wisely adopted the same form. The three divisions are thus established in our Kentucky Constitution:

> Section 27. "The powers of the government of the commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to-wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
>
> Section 28. "No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

These exact declarations were incorporated in our first Constitution, adopted April 19, 1792, and it is said that the illustrious Thomas Jefferson personally penned the affirmative prohibition against encroachment contained in section 28. This became the model for the Constitutions of other states; Kentucky being the first after the original thirteen to adopt a Constitution, although it was admitted as the second new state.

In establishing the executive department and describing its duties and powers, the power of pardon (except in case of impeachment) was vested in the Governor. This provision has been carried into our present Constitution (section 77), in the same form with the requirement that he shall file with each application for pardon a statement of the reasons for his decision, and the limitation that he shall not remit the fees of certain officers.

The power of the judiciary to set aside a pardon secured by fraud has not hitherto been before this court, although it has been the subject of judicial determination in other states, and it has often been broadly declared that a pardon obtained by fraud is void. 20 R. C. L. 550; 46 C. J. 1191.

Much has been written concerning the respective powers and rights of the trinity of government departments. The courts have not only been jealous to prevent interference with their rights, but have been as equally cautious not to interfere with the prerogatives of the other divisions, nor permit either of the others to invade their respective provinces. The independence has uniformly been recognized, yet it has also been recognized that all the departments are in many respects interdependent. In the recent case of Campbell v. Commonwealth, 229 Ky. 264, 17 S. W. (2d) 227, 229, 63 A. L. R. 932, in which was considered the jurisdiction of the courts to punish one for contempt of the Legislature, we observed:

> "The construction contended for by appellant (that it was an interference with constitutional legislative powers) would violate the letter and the spirit of the whole instrument, creating and providing that the divisions of government shall be co-ordinate; that is, of equal rank and importance, combining in harmonious action their delicate balance and respective functions, in order to maintain the rights of the sovereign citizens."

In Brown v. Turner, 70 N. C. 93, it is said:

> "The science of government is a practical one; therefore, while each should firmly maintain the essential powers belonging to it, it cannot be forgotten that the three co-ordinate parts constitute one brotherhood, whose common trust requires a mutual toleration of the occupancy of what seems to be a 'common cause of vicinage,' bordering the domains of each."

There is of necessity in the practical administration of government an overlapping, and this gives rise to difficulties when it is undertaken to discern a clear line of demarcation. The omnipotence of each department in its particular sphere has often been sustained by the judi-

ciary. Thus this court recognized the limitations of the judicial department by holding invalid an act of the Legislature undertaking to confer upon the judiciary the power to suspend the execution of a judgment in a criminal case, since it was in effect granting a parole, partaking of the nature of a pardon, and the exercise of that power clearly rests in the executive. Huggins v. Caldwell, Judge, 223 Ky. 468, 3 S. W. (2d) 1101. An illustration of the apparent though not actual infringement of the executive department on the judicial is to be found in Moyer v. Peabody, 212 U. S. 78, 29 S. Ct. 235, 53 L. Ed. 410, where it was held that the existence of insurrection empowers the Governor to suppress it by use of the state's military forces and to seize and imprison those resisting, public danger warranting the substitution of the executive for judicial process, the ordinary rights of the individuals yielding to what the executive deems the necessity of a critical moment. The power of the Legislature to usurp the appointing power of the Governor was denied in Sibert v. Garrett, 197 Ky. 19, 246 S. W. 455. The construction and interpretation of the powers of the executive and of his limitations in granting a pardon or commuting sentences have been often submitted to the courts, particularly as to conditions attaching to the pardon (Ex parte Davenport, 110 Tex. Cr. R. 326, 7 S. W. (2d) 589, 60 A. L. R. 1403), the extent of the Governor's power with respect to pardon for criminal contempt of courts (Ex parte Grossman, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131; State v. MaGee Publishing Co., 29 N. M. 455, 224 P. 1028, 38 A. L. R. 142), and it has been universally held that the Governor has no power to revoke an unconditional pardon after its delivery (Ex parte Crump, 10 Okl. Cr. 133, 135 P. 428, 47 L. R. A. [N. S.] 1036). Illustrations of apparent infringement by one department on the prerogatives of the others might be multiplied. It may be said that there are many acts in the twilight zones—where the departments are blending one into the other. Of course, the courts have declined always to interfere with the executive in the exercise of the discretion vested in him by the Constitution, and a mere error of judgment, or even the grossest abuse in the exercise of his lawful authority, is not reviewable by the courts. Within his jurisdiction both he and those who act by his direction are immune from judicial interference.

The granting of a pardon is an act of grace or justice —not on the part of an individual, but on the part of the sovereign. It was an attribute and prerogative of the crown, but even where the king had been led into the extension of clemency by fraud, the power of the courts to set aside the pardon was recognized, for says Blackstone:

> "It is a general rule that wherever it may reasonably be presumed the King is deceived the pardon is void; therefore any suppression of truth or suggestion of falsehood in a charter of pardon will vitiate the whole, for the King was misinformed." 4 Bl. Com. 400.

But the claimed divine right of kings and their absolute and arbitrary power are relics of the past. The body of the people is now the sovereign, so there is all the more reason for the rule. The sovereign people through their constitutional compact have delegated power to the court as their agency to determine guilt and apply appropriate remedies and inflict appropriate punishment for the violation of the rights of Society. They have also delegated to the Governor the power to extend mercy and to forgive—not a personal debtor, but a debtor to the body politic. Both the Governor and the court alike are the creatures and servants of the sovereign. Their respective powers emanate from the people. So the act of the Governor in granting a pardon is the official act of an agent, who for the time being has been invested with plenary power and an unlimited discretion as to its use. His motives in exercising that prerogative may not be questioned any more than can the motives of the Legislature in enacting a law or the court in adjudging the law. If the executive acts corruptly or fraudulently in granting a pardon, he is amenable to his master—the people— and punishable through impeachment, a procedure and power likewise provided by and emanating from the sovereignty.

We may quote from Biddle, Warden v. Perovich, 274 U. S. 480, 47 S. Ct. 664, 665, 71 L. Ed. 1161, 52 A. L. R. 832, this language of Mr. Justice Holmes:

> "A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate

authority that the public welfare will be better served by inflicting less than what the judgment fixed. See Ex parte Grossman, 267 U. S. 87, 120, 121, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131. Just as the original punishment would be imposed without regard to the prisoner's consent and in the teeth of his will, whether he liked it or not, the public welfare, not his consent determines what shall be done."

To set aside a pardon obtained by deception is not interfering with the executive department, but is protecting it. The commonwealth, which has been defrauded, simply comes to an agency which it has created and to which it has given appropriate powers and has it to exercise those powers by annulling a paper secured through foul deception from another servant to whom the remedy has not been given.

It is not the right of the Governor to issue the pardon that is in question, nor is there an interference or usurpation by the courts with his constitutional powers in that regard. To declare the pardon invalid is in effect but to deny the accused of all legal right thereunder and to prevent him from taking advantage of the wrong which he has practiced on the commonwealth. It is not unlike declaring void a land patent thus procured, nor those recent notable instances where the Supreme Court of the United States has held void valuable leases of government oil lands on the ground that they had been obtained from the Executive Department of the federal government through fraud, although there appeared to be concurring fraud on the part of the executive agent.

Fraud vitiates and destroys. Shall the court vitalize and restore? A vicious and iniquitous fraud has been perpetrated on society. Surely, the power of the people is not so ineffectual, nor the arm of the commonwealth so impotent, that the sovereignty cannot protect itself from such an imposition.

It has been uniformly held, as stated, that the Governor cannot revoke a pardon. Therefore, the power must lie in a court of equity. In the whole range of jurisprudence from the earliest times down to the present day, relief from fraud has called forth the beneficial exercise of the powers of courts of equity more often than anything else, and probably no field of remedial law has more

extended boundaries or has yielded more substantial fruits of justice. Bispham's Principles of Equity.

When our first Constitution was adopted, there was no precedent in this country, but the ancient rule that a pardon granted by the king of England might be set aside for fraud was undoubtedly known. Between its adoption and that of our present Constitution, a century later, the courts of other states having substantially if not identical provisions relating to the divisions of government and the granting of pardons had construed those provisions as not preventing a court of equity from annulling a pardon fraudulently procured. So it must be held that in promulgating this Constitution its framers did not intend that the provisions as to non-interference by one department with another should be understood as depriving the courts of this power. We are therefore of the opinion that when an application is made and an opportunity given to the defendant, the court has jurisdiction to protect the rights of the people against a pardon fraudulently obtained, and that there is no constitutional hindrance against declaring it void and of no effect. This seems the logical method for securing redress, although some courts hold it may be collaterally attacked in habeas corpus proceedings—a matter we need not here decide.

In the well-considered opinion and extensive annotations to Rathbun v. Baumel, 196 Iowa, 1233, 191 N. W. 297, 299, 30 A. L. R. 216, this is shown to be the prevailing doctrine, although a vigorous dissenting opinion concurred in by an equal number of the judges, and also the very plausible and elaborate opinion of Knapp v. Thomas, 39 Ohio St. 392, 48 Am. Rep. 462, to the contrary, are urged upon us. The decision in the Rathbun case is based upon the idea that the inquiry is merely into the title or right of the party holding a pardon secured by fraud to claim anything under it, and is not an interference by the judiciary with the voluntary and valid act of the executive. It is pertinently said in the opinion:

"It is a fundamental proposition that fraud in the procurement of any written instrument vitiates it in the hands of one seeking to benefit thereby. Likewise, it is one of the functions of a court of equity to set aside and hold for naught any written instrument that has its inception in fraud. Also, it

is an established maxim that one cannot lawfully profit by his own wrong. One of the most important functions of a court of equity is to inquire into the validity of written instruments that are impeachable for fraud. A pardon must be evidenced by a written instrument. It is not sufficient to vacate and supersede the judgment of a court, for the executive to orally say to the convict, 'Go, and sin no more.' A pardon is a deed to the validity of which delivery and acceptance are essential. U. S. v. Wilson, 7 Pet. 150, 8 L. Ed. 640; Com. (ex rel. Crosse) v. Halloway, 44 Pa. 210. 84 Am. Dec. 431; In re DePuy, (3 Ben. 307). 7 Fed. Cas. No. 3814; Carpenter v. Lord, 88 Or. 128, 171 P. 577, L. R. A. 1918D, 674; DeLeon v. Director of Prisons, 31 Philippine R. 60; Ex parte Ray, 18 Okl. Cr. 167, 193 P. 635.''

The opinion of the Kansas Supreme Court in Jamison v. Flanner, 116 Kan. 624, 228 P. 82, 35 A. L. R. 973, is replete with interesting historical and authoritative references to the pardoning power, its source and construction; and the conclusion is reached that courts may inquire into the authority of the Governor to issue the pardon and to interpret and construe such instrument. In the very recent case of Ex parte Bess, 150 S. E. 54, the Supreme Court of South Carolina, upon a review of the authorities, declared that there can be no doubt of the power of a court of equity to set aside and declare null and void a pardon which has been procured from the Governor by false representations or other species of fraud. It was held that the fraud must be judicially ascertained, and that that could not be done by the writ of habeas corpus, which is a prerogative writ—not an action—and that such procedure is in no sense the exercise of jurisdiction of a court of equity, which alone may decree the cancellation of an instrument for fraud. The dissenting judges were of the opinion that it could be determined by such a writ.

Counsel for appellant stresses this abstract statement of law given in Jackson v. Rose, Judge, 223 Ky. 285, 3 S. W. (2d) 641, 643:

''No court has the power to review the action of the executive in granting a pardon, for that would be the exercise of the pardoning power in part, and any attempt of the courts to interfere with the

·Executive in the exercise of the pardoning power would be a manifest usurpation of authority.''

· That case is entirely foreign, it being an original proceeding in this court to require the trial judge to recognize as valid a pardon granted by Governor Fields first in the name of Lattimore Johnson, instead of the defendant's correct name of Jackson. Later a second pardon for the same offense was issued in the correct name. The lower court was of the opinion that the one first issued was invalid because of the difference in the name, and the second one was of no effect as the Governor could not issue more than one pardon to one man for the identical offense. This court gave force to the act of the executive in granting the pardon, and the statement relied on was a mere declaration of the recognition by the courts of the executive powers, and in no wise militates against our conclusions in this case, for, as suggested, it is not the act of the executive, but the fraudulent act of the beneficiary, that is under consideration here.

To permit the appellant to profit by his vicious fraud by escaping trial on the serious charge of murder would be abhorrent to public policy and public justice. The courts derive their authority from the people, and, in the ultimate exercise of that authority, must protect them.

Accordingly, the judgment is affirmed.

Whole court sitting, except Judge WILLIS.