**COPPAGE CONSTRUCTION COMPANY, INC.,**
Appellant

v.

**SANITATION DISTRICT NO. 1 and DCI Properties–DKY, LLC, Appellee**

2013–SC–000122–DG

Supreme Court of Kentucky.

RENDERED: MAY 14, 2015

COUNSEL FOR APPELLANT: William Taylor Robinson, III, Sheryl G. Snyder, Griffin Terry Sumner, Jason Patrick Renzelmann, Donald Scott Gurney.

COUNSEL FOR APPELLEE SANITATION DISTRICT NO. 1: Jeffrey C. Mando, James Stephen Smith, Jennifer H. Langen, Michael Chad Surrey, Lynda Hils Mathews.

COUNSEL FOR APPELLEE DCI PROPERTIES–DKY, LLC: Robert Bowman Craig, Chad Robert Ziepfel.

OPINION OF THE COURT BY
JUSTICE ABRAMSON

Coppage Construction Company, Inc. Filed a third-party complaint in this action alleging contract, tort and statutory claims against Sanitation District No. 1 ("SD1"), a public sewer utility that provides services in three Northern Kentucky counties. The Kenton Circuit Court granted summary judgment in favor of SD1 on the basis of sovereign immunity, and the Court of Appeals affirmed. Having concluded that SD1 is not entitled to sovereign immunity under the analysis articulated in *Comair, Inc. v. Lexington–Fayette Urban Cnty. Airport Corp.,* 295 S.W.3d 91 (Ky. 2009), we now reverse the Court of Appeals and vacate the summary judgment order of the Kenton Circuit Court.

### RELEVANT FACTS

In 2005, DCI–Properties–DKY, LLC ("DCI"), a private development company, entered into an agreement with the City of Dayton to construct a mixed-use development project known as "Manhattan Harbour" on the city's Ohio River shoreline. The plan proposed by DCI called for the relocation of a sewer line owned by SD1. Initially, DCI proposed to replace the existing 7,400 linear feet of pipe with a line of the same general size and capacity. Recognizing the project as an opportunity to fulfill its obligations under a recent consent decree with state and federal environmental agencies, SD1 entered into negotiations with DCI to expand and improve the

district's sewer system. As a result, DCI's modified proposal was for an 84–inch diameter sewer line extending 8,000 linear feet, a line which SD1 would own upon completion. DCI and SD1 requested a price proposal for the construction of the sewer line project from Coppage.[1] After Coppage provided its proposal, SD1 entered into an agreement with DCI where SD1 agreed to pay approximately 70% of the $14.6 million estimated cost of the sewer line project (the "SD1 Contract"). The SD1 Contract incorporated Coppage's proposal and identified Coppage as the party to perform the work.

Very shortly thereafter,[2] DCI contracted with Coppage for the labor, services, and materials required to construct the new sewer line as well as other aspects of the Manhattan Harbour development (the "DCI–Coppage Contract"). SD1 was not a party to the DCI–Coppage Contract. By early 2008, disputes between the parties began to impede the progress of the sewer line project.[3] As delays in material delivery and construction began to mount, Coppage formally notified DCI that the DCI–Coppage Contract had been breached, and offered an opportunity to cure; instead, DCI elected to terminate the contract under a "termination-for-convenience" clause.[4]

On September 3, 2008, DCI filed suit against Coppage in Kenton Circuit Court seeking a declaration that Coppage was not entitled to any delay damages, and further seeking damages for breach of the DCI–Coppage Contract. Coppage initially filed a counterclaim alleging breach of contract and other claims,[5] and then in May of 2010[6] filed a third-party complaint against SD1 raising a number of contract, tort, and statutory claims. Chief among Coppage's claims in the third-party complaint was that SD1 was liable under the DCI–Coppage Contract pursuant to its partnership by estoppel with DCI, and that SD1's control of the sewer line project effected a novation. Coppage also alleged that SD1 was liable as a third-party beneficiary of the contract. In response, SD1 moved to dismiss Coppage's third-party complaint on the grounds that it was entitled to sovereign immunity. The Kenton Circuit Court converted SD1's motion to dismiss into a motion for summary judgment, and granted the motion. In that court's view, SD1 was entitled to sovereign immunity under the *Comair* analysis because SD1's "parent" ·entities (Campbell, Kenton and Boone Counties) are immune entities, and SD1 performs a function integral to state government.

The Court of Appeals affirmed the Kenton Circuit Court, describing SD1 as an

1. DCI is a development company with a single employee and no experience in sewer construction.

2. SD1 and DCI entered into their contract on June 21, 2007. DCI and Coppage contracted with one another on July 5, 2007.

3. Coppage claimed that disputes between SD1 and DCI concerning payment, scope, and engineering issues caused construction delays. SD1 denied this characterization, alleging instead that disagreements between DCI and Coppage led to the delays.

4. The "termination-for-convenience" clause of the DCI–Coppage contract permitted either party to terminate the agreement "at any time without cause."

5. Coppage's counterclaim also alleged claims ·of unjust enrichment, promissory estoppel, and a violation of the Kentucky Fairness in Construction Act. The counterclaim was later amended to assert claims for conversion and constructive trust.

6. In the intervening time, Coppage prevailed against SD1 in circuit court after SD1 failed to comply with Open Records Act requests.

"arm" of the three counties shrouded in the same immunity as those governments. The Court of Appeals distinguished *Calvert Investments, Inc. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.,* 805 S.W.2d 133 (Ky.1991), a case in which a metropolitan sewer district was held to have no immunity, by concluding that SD 1 performed "functions integral to state government" and was created under a different statute. This Court granted Coppage's motion for discretionary review and now holds that SD1 is not entitled to sovereign immunity.

### ANALYSIS

▋ The doctrine of sovereign immunity has vexed the courts of the Commonwealth for decades. Cases involving the immunity status of "quasigovernmental" or "public" entities have proven particularly troublesome, and for good reason: while the state enjoys immunity from suit, a level of constraint must be exercised in its application to other entities in order to respect both constitutional and important public policy limitations. *See e.g., Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001); *Kentucky Ctr. for the Arts Corp. v. Berns,* 801 S.W.2d 327 (Ky.1990).[7] In our recent *Comair* decision, this Court provided guidance for determining whether a "public" entity is entitled to sovereign immunity by setting forth a two-prong analysis. 295 S.W.3d at 91. First, the courts must look to the origin of the public entity, specifically: "was [the entity in question] created by the state or a county [which are entitled to immunity], or a city [which is not entitled to immunity except in the legislative and judicial realms]?" *Id.* at 99. The second and "more important" inquiry is whether the entity exercises a "function integral to state government." *Id.* at 99.

In applying the *Comair* analysis to SD1, the Court of Appeals determined that the sanitation district is entitled to sovereign immunity because: 1) three immune entities (Boone, Kenton, and Campbell Counties) compose its parentage; and 2) the services provided by SD1 are integral state functions. We disagree as to both conclusions. Before turning specifically to SD1, it is necessary to review in some detail the holding in *Comair.*

▋ The Court in *Comair* was tasked with determining whether an airport board and its associated airport corporation were properly considered agencies of the state, and therefore entitled to sovereign immunity. *See id.* The *Comair* analysis began by identifying the distinction between immune counties and non-immune cities. *Id.* at 94. From there, the Court recognized the extension of sovereign immunity to agencies, or "alter egos," of traditionally immune counties, while emphatically reaffirming our long-standing position of denying sovereign immunity to local government entities known as municipal corporations. *Id.* at 98–99, *see also Calvert,* 805 S.W.2d at 137. Municipal corporations are generally defined as "local entities created by [an] act of the General Assembly and not agencies performing the services of central state government." *Berns,* 801 S.W.2d at 331. Municipal corporations are "called into existence either at the direct solicitation or by the free consent of the persons composing them ... mainly for the interest, advantage, and convenience of the locality and its people." *Comair,* 295 S.W.3d at 100 (*quoting Marion Cnty. v. Rives &*

---

7. *See also Calvert,* 805 S.W.2d at 138, quoting Justice Palmore: "The concept that the government can do no wrong or that the government cannot afford to compensate those whom it wrongs in circumstances where a private entity would be required to pay is unacceptable in a just society."

*McChord,* 133 Ky. 477, 118 S.W. 309, 311 (1909)). By comparison, sovereign entities like counties are "superimposed by a sovereign and paramount authority ... with a view to the policy of the state at large, for purposes of political organization and civil administration." *Id.*

Surmising that an entity's origin and function represent the general dividing lines between immune alter-egos and non-immune municipal corporations, *Comair* set forth the aforementioned analytical framework that focuses on whether the entity in question was created by the state or a county, as opposed to a city, and then whether the functions the entity performs are integral to state government. *See id.* at 98–99. Application of the *Comair* principles to SD1 dispels any notion that it is entitled to sovereign immunity.

**I. Sanitation Districts, Including SD1, Are Not Created by the Power of the Sovereign and Do Not Operate as an Arm or Alter Ego of the Counties They Serve.**

The Court of Appeals concluded that SD1 was "established" by the Kenton, Boone, and Campbell Fiscal Courts and is entitled to immunity as an "offspring" of those counties. In reaching this determination, that Court summarily reasoned

that SD1 functions as an "arm" of the "parent" counties "within its geographical boundaries." However, this conclusion overlooks both the facts and significant provisions of Kentucky Revised Statutes (KRS) Chapter 220, the chapter providing for the creation and operation of sanitation districts.[8]

A sanitation district is a political subdivision, or municipal corporation,[9] managed by a board of directors and governed by articles of incorporation. KRS 220.110–170. A sanitation district is a form of "special district," the latter being defined as "any agency, authority, or political subdivision of the state which exercises less than statewide jurisdiction and which is organized for the purpose of performing governmental or other prescribed functions within limited boundaries." KRS 65.005. Special districts encompass "all political subdivisions of the state except a city, a county, or a school district," id. and specifically include sanitation districts formed pursuant to KRS Chapter 220. KRS 65.060. Plainly, SD1 is a sanitation district and therefore a species of special district.

Special districts are typically created, at least in part, to avoid constitutional and statutory restrictions on a county's indebt-

---

**8.** SD1 was actually created pursuant to Chapter 148 of the 1940 Kentucky Acts, the predecessor to KRS Chapter 220, but the parties and lower courts have identified no distinctions in the two versions of the law that affect the issues before us. SD1 presents its case relying on specific provisions of the current law.

**9.** "Sanitation District No. 1 of Jefferson County is a municipal corporation or political subdivision organized under the provisions of Chapter 220, Ky. Rev. Statutes." *Sanitation Dist. No. 1 of Jefferson Cnty. v. Campbell,* 249 S.W.2d 767, 769 (Ky. 1952). *See also Sanitation Dist. No. 1 of Shelby Cnty. v. Shelby Cnty.,* 964 S.W.2d 434, 435 (Ky. App. 1998) (in a case involving a sanitation district in Shelby

County, the Court of Appeals characterized the district as "a political subdivision, or municipal corporation, of the Commonwealth of Kentucky ... and organized pursuant to the provisions of KRS Chapter 220 et seq."). As this Court noted in *Calvert,* 805 S.W.2d at 137, "[t]he term municipal corporation was at first only applied to 'cities, towns and villages,' but in the context of our discussion [regarding the Metropolitan Sewer District] this is a matter of historical interest only and not of legal consequences. These were the first local public corporations created by the sovereign state; the use of public corporations to perform special functions at the local level is of relatively recent origin."

edness and tax rates. *See* Ky. Const. 157; *Lowery v. Jefferson Cnty.*, 458 S.W.2d 168, 173 (Ky.1970). Thus, sanitation districts are fiscally separate from the counties or municipalities they serve. They primarily derive their revenues from the imposition of fees on customers, but they are also permitted to issue bonds "us[ing] the authority and procedures granted to *incorporated municipalities* [.]" KRS 220.380(2) (emphasis added); see *also* KRS 107.010—107.220. A sanitation district's board of directors is "the governing body of the sanitation district and shall exercise all the powers and manage and control all the affairs and property of the district." KRS 220.170(3). The judge-executives of the counties within a multi-county sanitation district are allowed to review, approve or disapprove budgets and capital improvements, KRS 220.035, but the affected counties' fiscal interests are not directly implicated.

Particularly pertinent to the matter before us is the manner in which a sanitation district is created. Under KRS Chapter 220.040(1), a petition "containing valid signatures of sixty percent (60%)" of the affected landowners in the proposed district may be used to establish a sanitation district provided the petition is "approved as to propriety and necessity by the county board of health of each county affected." Alternatively, "when authorized by ordinance, such a petition may be signed by the governing body of any municipality lying wholly or partly within the proposed district." [10] KRS 220.040(2). Only after a qualifying petition is received, and either garners no objection or, if challenged, is upheld in the courts, can the commissioner of sanitation districts declare the establishment of a particular district. KRS 220.010.

In analyzing SD1's origin, the Court of Appeals failed to consider the import of KRS 220.040 or its predecessor statute. Cognizant of this statutory framework, we turn to our *Comair* analysis to determine whether SD1 was truly *created* by a county or counties, local subdivisions of the state which have long enjoyed sovereign immunity. More specifically, was SD1 "created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit [the district]?" 295 S.W.3d at 100. Without question, SD1 was not created by Boone, Campbell, and Kenton Counties or the "paramount authority" of the sovereign. *Id.* Instead, it was created pursuant to KRS Chapter 220's predecessor, Chapter 148 of the 1940 Kentucky Acts "... by petition of about seventeen incorporated areas and communities located in northern Kentucky." *City of Covington v. Sanitation Dist. No. 1 of Campbell and Kenton Counties,* 301 S.W.2d 885, 886 (Ky. 1957). And while SD1 correctly asserts that such petition must be approved by the county board of health, KRS 220.040(1), a sanitation district *cannot* be created without the "direct solicitation or ... the free consent" of the affected landowners in the form of a petition signed by individuals or the governing body of their municipality. *See Comair,* 295 S.W.3d at 100. Simply put, no county can impose a sanitation district upon its citizens under KRS Chapter 220 (or its predecessor), and none of the counties involved in this litigation "created" SD1.

Against this fact of origin, SD1 maintains that because Boone, Kenton, and

---

**10.** Under the predecessor statute, ninety percent (90%) of the affected landowners or the governing bodies of the affected municipalities were necessary for a qualifying petition. 1940 Ky. Acts, Chap. 148, § 4.

Campbell Counties exercise substantial control over the sanitation district's operations, SD1 is an arm or alter ego of those counties and derives sovereign immunity from them. SD1 cites several provisions of KRS Chapter 220 in support of this theory. For example, the county judge-executives of the three counties within the district appoint members to SD1's board of directors. KRS 220.140. The judge-executives also meet at least once annually to approve SD1's budget, and proposed land acquisitions, capital improvements, and certain fees. KRS 220.035(4). The county fiscal courts are called upon to approve rate and fee increases greater than 5% of the previous charge. KRS 220.542.

■ However, a governmental entity's authority to appoint board members does not (in and of itself) create an agency relationship. *Phelps v. Louisville Water Co.,* 103 S.W.3d 46 (Ky.2003). In that same vein, courts have held that a fiscal court's oversight of a sanitation district's budget and expenditures does not equate to "dual management." *Sanitation Dist. No.1 of Shelby Cnty. v. Shelby Cnty.,* 964 S.W.2d at 436–38. Those statutory features, individually and collectively, do not suffice to render a sanitation district an alter ego of the counties it serves. By contrast, in *Comair,* this Court concluded that the airport board was a county agency entitled to sovereign immunity. In doing so, we pointed to the Lexington–Fayette Urban County Government's direct *statutory authority* to usurp the power of the airport board and exercise regulatory control over the airport. 295 S.W.3d at 100–01 (citing KRS 183.133(6)). As Coppage emphasizes, there is no comparable provision pertaining to sanitation districts in KRS Chapter 220. SD1, a special district created "by the free consent of the persons composing [it]," *id.* through a petition process and managed by a board of directors

that exercises "all the powers and manage and control[s] all the affairs and property of the district," KRS 220.170(3), simply does not satisfy *Comair*'s first prong.

## II. Like Other Sanitation Districts, SD1 Performs a Local, Proprietary Function.

■ The question of whether an entity carries out an integral state function has remained the primary focus of our sovereign immunity analysis since at least the turn of the twentieth century. *Comair,* 295 S.W.3d at 99 (citing *Gross v. Kentucky Bd. of Managers of World's Columbian Exposition,* 105 Ky. 840, 49 S.W. 458 (1899)). "An analysis of what an agency actually does is required to determine its immunity status." *Id.* at 102 (quoting *Autry v. Western Kentucky University,* 219 S.W.3d 713, 717 (2007)). Significantly, the second *Comair* prong addresses *two* elements: whether the entity's function is "governmental" as opposed to proprietary, and whether it is a matter of "statewide" concern. These distinctions are important because not every "public purpose" qualifies as an "integral state function." If that were the case, sovereign immunity would extend far beyond its current constraints, reaching virtually every local government agency fulfilling a perceived "public purpose."

This case is not this Court's first opportunity to consider whether a special district providing sanitary sewer and storm water drainage systems qualifies for sovereign immunity. Almost twenty-five years ago, in *Calvert,* 805 S.W.2d at 133, the Court addressed the immunity status of the Louisville & Jefferson County Metropolitan Sewer District ("MSD"). As explained at that time, sewer districts are established as special districts "to carry out a limited public purpose in a local area," *id.* at 135, and, unlike counties or school districts, perform "services similar

to a private corporation[.]" *Id.* at 138. With these characteristics in mind, the *Calvert* Court had little difficulty concluding that MSD, a municipal corporation designated to perform a local function, was not entitled to sovereign immunity. *Id.*

In the case at bar, the Court of Appeals rejected the application of *Calvert* to SD1, finding it distinguishable on the grounds that MSD was created under KRS Chapter 76, while SD1 was created under KRS Chapter 220. The appellate court further reasoned that the functions of a sanitation district as outlined in KRS 220.030 (*i.e.,* stream pollution prevention, regulation of stream flow for sanitary purposes, collection and disposal of sewage, and sewage management) constitute matters integral to state government. We disagree that *Calvert* is distinguishable and has been effectively overruled by *Comair.* At least to the extent *Calvert* held that a sewer district performing sanitary sewer and storm water management functions in a local area is not entitled to sovereign immunity, it remains sound law.[11]

The mere fact that a metropolitan sewer district and a sanitation district are governed by different statutes is simply a distinction without a difference when those statutes are compared side-by-side. Under KRS 76.010, a sewer district is designated as a:

'[A] public body corporate, and **political subdivision,** with power to adopt, use, and alter at its pleasure a corporate seal, **sue and be sued, contract and be contracted with,** and in other ways to act as a natural person[.]' (emphasis supplied).

KRS 220.110 employs similar language for sanitation districts such as SD1:

The district shall then be a **political subdivision ... with power to sue and be sued, contract and be contracted with,** incur liabilities and obligations[.]' (emphasis supplied).

The legislature has characterized *both* sewer and sanitation districts as political subdivisions with the power to sue and be sued. The sewer district in *Calvert* is organized as a special district, or a "distinct municipal corporation." 805 S.W.2d at 136. As explained *supra,* SD1 is *also* organized as a special district—a subset of municipal corporations. *See* KRS 65.005. Both entities construct, maintain, operate and repair sewage disposal and storm water drainage systems. *Cf.* KRS 76.080(1)-(2) *and* KRS 220.030(4)–(5). The virtually identical nature of MSD, the sewer district in *Calvert,* and SD1 as well as the virtually identical, if not identical services they offer, are far more compelling considerations in our analysis than any slight differences in the governing statutes.

Nevertheless, SD1 argues that it performs functions that are integral to state government because it promotes the Commonwealth's policy of maintaining a clean water supply. In support of this position, SD1 argues that the KRS 220.030 [12] statement of purposes for which

---

11. SD1 argues that *Calvert* would be decided differently under *Comair,* asserting that *Calvert* relied on the two-part *Berns* test—a test which *Comair* rejected. *See Comair,* 295 S.W.3d at 99. We agree that *Comair* is now the controlling case but *Comair's* treatment of municipal corporations does not differ significantly from *Calvert's* treatment of the same.

12. That statute provides:

Sanitation districts may be established for any of the following purposes:

(1) To prevent and correct the pollution of streams.

(2) To regulate the flow of streams for sanitary purposes.

(3) To clean and improve stream channels for sanitary purposes.

(4) To provide for the collection and disposal of sewage and other liquid wastes pro-

a sanitation district may be established is part of a regulatory scheme designed to protect the state's water supply in furtherance of the policy of conservation and protection. *See* KRS 224.70–100. In fact, there is no statute cross-referencing the sanitation districts created pursuant to KRS Chapter 220 with the water quality policies and purposes stated in KRS 224.70–100. KRS 220.030(1)-(3), the "stream" provisions that SD1 emphasizes, were present verbatim in § 3 of the 1940 Act and predate the clean water provisions of KRS 224.70–100 through .70–140 by ten years. All persons in the Commonwealth are prohibited from polluting our waters, whether that person is an individual, a metropolitan sewer district, a sanitation district or any form of public or private corporation. KRS 224.70–110. Certainly, sanitation districts have no special role that distinguishes them in any way from a metropolitan sewer district, which is equally charged with maintaining effective sewage disposal systems conducive to a clean water supply.

Additionally, while the services provided by SD1 are no doubt critically important within the counties it serves, SD1 simply does not perform an integral state function. Sewage disposal and storm water management systems are not a traditional and necessary state function such as those functions performed by the state police, our public schools, the corrections system, and public highways and airways. *See Comair*, 295 S.W.3d at 99. *See also Gas Service Co., Inc. v. City of London*, 687 S.W.2d 144, 147–48 (Ky.1985) (repair and maintenance of sewers is a local pro-

prietary, not state, function). Unlike the airport board and airport corporation in *Comair*, SD1 does not provide services critical to Kentucky's infrastructure. In *Comair*, the airport board exercised a function integral to state government "[b]y providing essential transportation infrastructure to the citizens of the Commonwealth." *Id.* at 104. Both airways and roadways are "essential for commercial and private transportation of people, cargo, and mail" throughout the state and are of "prime importance in the industrial development of the state." *Id.* at 101 (internal quotation omitted). SD1's services are not tantamount in scope to the air transportation services in *Comair*. Instead, the sewage disposal and storm water drainage services SD1 offers are designed to meet the needs of a discrete, localized geographic region.

In sum, SD1 was not created by the state or a county and it does not carry out a function integral to state government. Because SD1 fails to satisfy either element of the *Comair* test, it is not entitled to sovereign immunity. Upon remand of this matter to the circuit court, Coppage may proceed with its contract, tort and statutory claims against SD1.

### CONCLUSION

For reasons explained herein, the decision of the Court of Appeals is reversed, the Kenton Circuit Court's summary judgment order is vacated and this matter is remanded to the Kenton Circuit Court for further proceedings consistent with this Opinion.

---

duced within the district; and incident to those purposes and to enable their accomplishment, to construct, with all appurtenances, laterals, trunk sewers, intercepting sewers, siphons, pumping stations, treatment and disposal works, to maintain, operate, and repair these, and do all other

things necessary for the fulfillment of the purposes of KRS 220.010 to 220.520.

(5) To provide for the management of onsite sewage disposal systems.

(6) To develop and implement plans for the collection and disposal of storm drainage.

All sitting. Minton, C.J.; Barber, Cunningham, Noble, and Venters, JJ., concur. Keller, J., concurs in result only. Venters, J., concurs by separate opinion in which Cunningham, J., joins.

VENTERS, J., CONCURRING:

The majority relies upon two important factors to be considered in determining when an entity is shielded from liability by the doctrine of sovereign immunity: first, whether the entity was created by a governmental body that has sovereign immunity, since it would be difficult to conceive how a non-immune entity could bestow upon its offspring sovereign immunity which itself did not have; and second, whether the entity exercises a function that is integral to state government, since protecting state functions from the disruptive impact of litigation is essential to the societal well-being. Although I fully concur with the majority opinion, I write separately to emphasize the importance of a third factor that we have historically taken into account—whether the imposition of legal liability upon the entity adversely affects the public treasury such that it could compel the payment of funds from the state treasury without an appropriation or an expression of consent by the legislature. Because the imposition of liability upon SD1 in this case poses no threat to the public treasury, this historical justification for sovereign immunity is absent. Where the reason for a doctrine does not apply, there is no reason to apply that doctrine.

It has long been recognized within the common law that the historical origin of the doctrine of sovereign immunity was, in part, the protection of the king's purse. While it is often said the doctrine arose out of the notion that "the king could do no wrong," the more practical, though perhaps ignoble, rationale for immunity from governmental wrongdoing was to spare the king's exchequer from having to pay for the trespasses of his agents without his consent.

In the earliest days of the United States, the Supreme Court, examining its own power to entertain suits against the States, reviewed the English history of sovereign immunity:

> [S]uch an authority could not have been exercised by any other Court in Westminster-Hall, or by any Court that from its particular constitution had no controul over the revenues of the Kingdom. Lord C.J. Holt, and Lord Somers (though they differed in the main point) both agreed in that case, that the Court of King's bench could not send a writ to the Treasury.
>
> . . .
>
> But in all cases of petition of right, of whatever nature is the demand, I think it is clear beyond all doubt, that there must be some indorsement or order of the King himself to warrant any further proceedings. The remedy, in the language of Blackstone, being a matter of grace [of the King], and not on compulsion [from the Court].

*Chisholm v. Georgia,* 2 U.S. 2 Dall. 419, 444, 1 L.Ed. 440 (1793).

"[A] primary purpose of the doctrine of sovereign immunity is the protection of the public purse." *DeKalb County School Dist. v. Gold,* 318 Ga.App. 633, 734 S.E.2d 466, 473 (2012). "One of the most often repeated explanations for the rule of state immunity from suits in tort is the necessity to protect the public purse. However, protection of the public purse is but one of several purposes for the rule." *Niese v. City of Alexandria,* 264 Va. 230, 564 S.E.2d 127, 133 (2002) (*quoting Messina v. Burden,* 228 Va. 301, 321 S.E.2d 657, 660 (1984)).

Under the English monarchical form of governance that preceded the founding of this country, only the monarch had the authority to say when and how the wealth of his or her treasury would be paid out. "Although the American people had rejected other aspects of English political theory, the doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified." *Alden v. Maine*, 527 U.S. 706, 715–16, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). That this common law heritage survives today in its modern form is founded in considerable part upon the recognition that the people now occupy the place of the monarch as the sovereign. *Adkins v. Commonwealth*, 232 Ky. 312, 23 S.W.2d 277, 279 (1929) ("[The] absolute and arbitrary power [of the king] are relics of the past. The body of the people is now the sovereign."). Citing to *Chisholm*, our predecessor court explained in *Foley Const Co. v. Ward*:

> [C]laims for money if successfully presented were satisfied from the king's personal funds. Later, as the king became dependent on the ordinary support of the government, it became necessary for Parliament to provide funds for the redress of such wrongs or payment of the claim. Thus arose the present principle in which the assent of the Legislature is required in order to sue the state.

375 S.W.2d 392, 393 (Ky.1963).

The people of Kentucky, through § 230 of the Kentucky Constitution,[13] have invested in the General Assembly with the legislative power to appropriate funds from the public purse. *See Ross v. Gross*, 300 Ky. 337, 188 S.W.2d 475 (1945) ("[T]he purpose of [§ 230] is to prevent the expenditure of the state's money without consent of legislature."). It follows that through the fundamental principles of the separation of powers embedded in our Constitution, the courts cannot dictate to the legislature how the public treasury is to be disbursed. *See* Kentucky Constitution, § 28 ("No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.")

This principle is expressly reflected in the seminal case of *Kentucky Center for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky.1990):

> [O]ur Court has recognized [§ 230] as constitutionally protecting sovereign immunity in "suits against the Commonwealth" because otherwise it has no meaning. From its genesis in the First Constitution of 1792, Article VIII, § 4, to the Fourth Constitution of 1891 (the present Constitution), the pronouncement has followed immediately in sequence a proviso that "no money shall be drawn from the state treasury but in consequence of appropriations made by law." The "Debates, Kentucky Convention 1849," pp. 628–30, confirm the tie-in between §§ 230 and 231 of the present Constitution. These two sections recognize the existence at common law of sovereign immunity and authorize the General Assembly, by general act, to establish a method for adjusting claims against the state government as an alternative to private, special legislation. The purpose of the second section in the sequence (now § 231) is to make it possible for the General Assembly to provide a formula to pay claims by general

---

**13.** Section 230 states: "No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law; and a regular statement and account of the receipts and expenditures of all public money shall be published annually....".

law from the state treasury without violating the first section. Without § 231, a statute permitting judgments against the Commonwealth to be paid out of the state treasury would violate the previous section.

*Id.* at 329.

With the above backdrop in mind, it is apparent that a test for whether an entity such as SD1 enjoys the protections of immunity from suit is whether the fiscal liability of the agency puts the public treasury at risk. If it does, then the concern for that fiscal liability is within the province of the legislative branch, not the judicial branch; the judicial branch would thus be bound by our Constitution to defer to the legislature unless the legislature has expressly consented to adjudication. If, however, the public treasury is not put at risk, then a major rationale for cloaking the entity with immunity simply does not exist.

As the majority opinion clearly states, "[t]he judge-executives of the counties within a multi-county sanitation district are allowed to review, approve, or disapprove budgets and capital improvements, KRS 220.035, *but the affected counties' fiscal interests are not directly implicated.*" Op. at 860 (emphasis added). Subjecting SD1 to the rigors of a lawsuit does not put the public treasury at risk. Therefore, in addition to the grounds cited by the majority, the fact that SD1's liabilities cannot invade or put at risk "the king's purse" is an equally significant reason for declining to recognize it as an entity that is cloaked in sovereign immunity.

Cunningham, J., joins.