GRIFFIN, Circuit Judge,
dissenting.
DISSENT
I respectfully dissent. I would affirm the summary judgment granted in favor of defendant Southern Health Partners, Inc. (SHP) on both claims.
Regarding plaintiff Shadrick’s § 1983 claim, the majority opinion acknowledges that SHP maintained a policy requiring its LPNs to monitor and treat Tyler Butler’s staph infection under the guidance of its medical director, a licensed physician. Still, it concludes that the LPN training program posed so “obvious” a risk to Butler’s rights that SHP can be held liable “without proof of a pre-existing pattern of [constitutional] violations.” Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1361, 179 L.Ed.2d 417 (2011). In so holding, the majority expands the theory of “single-incident” liability beyond the narrow circumstances contemplated in City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and Connick, 131 S.Ct. at 1361-63.
With respect to plaintiffs state-law negligence claim, my colleagues take the opposite approach, limiting the availability of qualified official immunity in ways not recognized under Kentucky law. But precedent on this issue is clear: private entities that contract with a Kentucky county to provide medical services to county jail inmates — like SHP — are eligible for qualified official immunity irrespective of their business form or origin. See Jerauld ex rel. Robinson v. Kroger, 353 S.W.3d 636, 641 (Ky.Ct.App.2011); see also Autry v. W. Ky. Univ., 219 S.W.3d 713, 719 (Ky.2007).
I.
The first issue is whether the district court properly granted summary judgment in favor of SHP on Shadrick’s § 1983 claim. The parties, my colleagues, and I agree that Shadrick’s claim against SHP is controlled by Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
As we have repeatedly cautioned in the context of Monell claims, courts must resist the temptation to impose vicarious liability upon entities like SHP for the egregious conduct of their employees. Under Monell, governmental actors “are responsible only for their own illegal acts. They are not vicariously liable under § 1983 for their employees’ actions.” D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir.), cert. denied, — U.S.—, 135 S.Ct. 758, 190 L.Ed.2d 628 (2014). Furthermore, the dis-positive question regarding SHP’s liability is whether “the challenged conduct occurred] pursuant to [SHP’s] ‘official policy,’ such that [SHP’s] promulgation or adoption of the policy can be said to have ‘cause[d]’ one of its employees to violate the plaintiffs constitutional rights.” Id. *752 (quoting Monell, 436 U.S. at 692, 98 S.Ct. 2018). In other words, SHP “is liable under § 1983 only where, ‘through its deliberate conduct,’ it was ‘the moving force behind the injury alleged.’ ” Id. at 389 (quoting Alman v. Reed, 703 F.3d 887, 903 (6th Cir.2013)).
Because the focus must be on SHP’s own decisions rather than those of its employees, SHP can be found liable only if it has (1) consciously adopted a specific “policy” of perpetrating unconstitutional conduct despite (2) having actual or constructive notice that the policy will cause employees to violate constitutional rights, such that SHP can be considered “deliberately indifferent” to the fact that its employees will spread constitutional harm. Connick, 131 S.Ct. at 1359-60.
Given that Monell liability presupposes a conscious adoption of a course of action “from among various alternatives,” City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), a government entity’s “culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.” Connick, 131 S.Ct. at 1359. After all, “[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city ‘could have done’ to prevent the unfortunate incident.” Id. at 1363 (citation omitted). If an employee acts in a particularly egregious manner, it may be tempting to collapse the Monell analysis into a respondeat superior test and to blame the wrongdoer’s employer for failing to ensure that she would do a better job. See id. at 1365 & n. 12. This is the mistake Shadrick makes, claiming that “SHP’s LPNs’ responsibilities were so obvious, their violations of SHP’s policies so multitudinous, and their ignorance of Mr. Butler’s condition so glaring, that SHP must be held responsible.” (Opening Br. at 30; see also id. at 31-32 (“The fact that SHP’s nurses violated virtually every provision of SHP’s policies bearing on Mr. Butler’s care and treatment speaks to their lack of training, SHP’s indifference, and its resultant liability.”)).
But as the Supreme Court recently reiterated, an essential characteristic of a failure-to-train claim is that it requires more than merely substandard training. A plaintiff must show that the government entity’s failure to train its employees in relevant respects is not merely a negligent omission; it must amount to a conscious “decision not to train certain employees about their legal duty to avoid violating citizens’ rights.” Connick, 131 S.Ct. at 1359. “ ‘[Deliberate indifference’ is a stringent standard of fault”; Monell liability applies only when a state actor has itself decided to violate the Constitution by retaining a defective training program that it constructively or actually knows causes employees to violate citizens’ constitutional rights. Id. at 1360 (quoting Bd. of Cty. Comm’rs of Bryan Cty. v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).
In the present case, it certainly appears that one or more of SHP’s employees was negligent in following SHP’s policies and providing Butler with appropriate eare-with catastrophic results. But the fact that SHP’s training of these particular personnel may have been inadequate does not itself establish that SHP was deliberately indifferent to inmates’ constitutional rights. Deliberate indifference, unlike negligence, requires intent. It is not enough to demonstrate only that SHP’s training regimen did not comport with best practices; Shadrick must establish that SHP was on notice that its training program was constitutionally deficient but consciously decided not to correct it.
*753 The evidence submitted by Shadrick does not create a jury question regarding whether SHP consciously decided to adopt a policy that it knew would cause its employees to violate inmates’ constitutional rights. It is undisputed that SHP promulgated policies guiding its nurses’ conduct in providing health care to inmates, required its nurses to read and sign its policies, provided on-the-job training to its nurses, and held routine monthly meetings with its nurses to review the policies and any updates to them. SHP’s policies specifically required nurses to examine inmates presenting symptoms of drug or alcohol use or staph infections and to notify and seek treatment authority and review from the facility’s medical director. In fact, Shadrick argued in the district court (and on appeal) that the individual nurses were liable because of their failure to abide by SHP’s extant policies. In other words, Shadrick’s claim against the nurses hinges partially on her theory that Butler’s death would have been averted had the.nurses followed the SHP policies upon which they had been trained. The majority is apparently swayed by this argument, citing multiple instances in which SHP’s employees failed to follow, or appeared unfamiliar with, the company’s polices. But if the underlying harm was caused by employees’ deviation from SHP’s policies, then Monell liability cannot lie: the harm is the fault of the individual employees and is not attributable to the governmental entity that employed them.
Despite the fact that SHP trained its nurses on applicable policies that — if followed — would have prevented the harm suffered in this case, Shadrick contends that SHP should have trained them more extensively. Specifically, she asserts that SHP should have trained its LPNs that they could not “treat[ ] conditions outside their scope of practice and without notifying or consulting SHP’s contract physician.”
“Without notice that a course of training is deficient in a particular respect, deci-sionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.” Connick, 131 S.Ct. at 1360. Thus, Shadrick’s claim turns on whether a reasonable jury could find that SHP had actual or constructive notice that its nurses were deficiently trained in violation of the Constitution, despite its policies. Id. On the evidence Shadrick provided, I submit that it could not.
“[Ojrdinarily,” plaintiffs must demonstrate notice by pointing to a prior pattern of similar constitutional violations by inadequately trained employees. Id. This is because, “[ujntil the [government entity] had notice of persistent misconduct, it did not have ‘the opportunity to conform to constitutional dictates,’ nor could its inaction have caused the deprivation of [the plaintiffs] constitutional rights.” D’Ambrosio, 747 F.3d at 388 (quoting Connick, 131 S.Ct. at 1360 n. 7). If the government entity continued to follow the training program, notwithstanding its awareness of past violations, the plaintiff may establish that the entity acted with the deliberate indifference “necessary to trigger municipal liability.” Bryan Cty., 520 U.S. at 407, 117 S.Ct. 1382.
Alternatively, in a “narrowfer] range of circumstances,” see id. at 409, 117 S.Ct. 1382 deliberate indifference may also be proven under the “single-incident” theory of liability hypothesized by the Supreme Court in Canton, 489 U.S. at 390 & n. 10, 109 S.Ct. 1197. In essence, the theory is that, in some “rare” circumstances, “the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of viola *754 tions.” Connick, 131 S.Ct. at 1361. Canton gave one example of this hypothesis: where a municipality provides its police officers with firearms, the need to train officers on the constitutional limitations on the use of deadly force is “so obvious” that the failure to do so would amount to deliberate indifference. Canton, 489 U.S. at 390 n. 10, 109 S.Ct. 1197. Taking up the mantle of Canton, the majority concludes that an inmate’s need for competent medical care is so obvious that SHP’s failure to train its nurses regarding when to notify medical directors about suspected staph infections amounts to deliberate indifference.
There are two problems with this position. First, the single-incident theory of liability described in Canton applies only rarely outside of the use-of-deadly-force-training example that Canton provided. For example, the Fifth Circuit recently attempted to extend the single-incident liability theory to the failure of a prosecutor’s office to train its prosecutors about their Brady obligations.[1] But the Supreme Court rejected that extension, observing that the Canton hypothetical “assumes ... no knowledge at all” of the requisite constitutional standards, whereas it was undisputed that prosecutors knew the general contours of their Brady obligations. See Connick, 131 S.Ct. at 1363. More fundamentally, explained the Court, the Canton hypothetical involved a circumstance where a police officer was expected to make a professional judgment that lay outside his area of expertise: absent specific training, he would not be “equipped with the tools” needed to make the relevant legal determination. Id. at 1364. By contrast, an attorney asked to make a Brady determination is not required to go beyond the bounds of his professional specialty: he is a legal professional tasked with making a professional legal determination — which his employer could reasonably expect that his generalized professional training, on-the-job experience, and adherence to professional competence and ethics standards would generally prepare him to do. See id. at 1361-63. Given that an employer could expect a legal professional to be able to ascertain for himself his basic legal obligations, the failure of the prosecutor’s office to alert its attorneys to the full panoply of their legal duties did not subject it to failure-to-train liability, even if “additional training would have been helpful.” Id. at 1363.
Connick’s reasoning is squarely applicable to the LPNs in the present case. An LPN making a rudimentary decision regarding how severe an inmate’s symptoms are is not engaging in the type of professional cross-over envisioned in Canton’s hypothetical. Instead, LPNs in such situations are medical personnel making rudimentary medical judgments. Although the majority presents LPNs as if they have no medical ability whatsoever, they are clearly trained in the medical field, have at least some degree of knowledge about medical symptoms presented by inmates, and are expected to make at least basic decisions about identifying circumstances under which further medical examination (such as by a doctor) is necessary. No doubt more advanced training would make them better able to do so; but the fact that, in hindsight, SHP could have done more instead of primarily relying upon its LPNs’ formal medical training does not make SHP liable under Monell. See Connick, 131 S.Ct. at 1364 (“[Sjhowing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.”).
*755 The second point is related. Even with the single-incident theory applied in this context, the particular need at issue — the need for increased training regarding when an LPN should contact a medical director — is far from “obvious.” In this regard, the majority conflates the generalized need for competent medical care with the much more particularized need for LPNs to be trained regarding the appropriate circumstances under which to refer inmates to a medical director. See Bryan Cty., 520 U.S. at 412, 117 S.Ct. 1382 (observing that culpability “depend[s] on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff’). The Canton exception applies, if ever, only when the need is so patent as to be self-evident: training for armed officers on the constitutional boundaries of the use of deadly force, for instance. See id. at 410, 117 S.Ct. 1382 (noting that the single-incident theory applies only if there is a “glaring omission in a training regimen”). By contrast, the need here is much more particularized. It is not at all obvious that an LPN who has already completed a course of study and has been specifically instructed to follow SHP’s written policies will always need more training regarding when to contact a medical director about a suspected staph infection. It is undisputed that SHP did, in fact, have policies in place on this question, which it required its nurses to read and follow. Therefore, Canton’s hypothesized single-incident theory does not apply to this case.
Shadrick also argues SHP had notice that its training program was constitutionally deficient based on a prior pattern of similar constitutional violations by SHP employees. However, the majority declines to reach this issue. In this regard, I note that Shadrick’s pattern-of-prior-incidents theory lacks its most basic requirement: a pattern.
The sequence of prior constitutional violations must be “similar” to the misconduct alleged in the case at hand for the prior violations to have put the government entity on notice that the same conduct was likely to reoccur. Connick, 131 S.Ct. at 1360. Connick gave some clues as to how particularized the similarity must be. There, the Court tied the notice requirement not simply to the generalized type of constitutional harm at issue, but to the specific manner in which the constitutional harm occurred. Connick held that four prior Brady violations did not place a prosecutor’s office on notice that its training was inadequate “with respect to the sort of Brady violation at issue here” because none of the prior Brady violations “involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.” Id. In other words, the previous instances of misconduct must not only violate the same constitutional rights, but they must violate them in almost the same way. See D’Ambrosio, 747 F.3d at 388 (three prior instances of impermissible prosecutorial statements did not give municipality notice that a prosecutor would likely commit a Brady violation).
Shadrick claims that SHP’s deliberate indifference to inmates’ plight is demonstrated by the fact that, before Butler died, several other inmates received substandard medical treatment in other jails staffed by SHP. She points to two incidents in particular: (1) the March 2009 death of an inmate in a Warren County, Kentucky jail, under circumstances where the nurse hired by SHP failed to contact the medical director for an inmate who exhibited symptoms of alcohol withdrawal, see Finn v. Warren Cty., 768 F.3d 441, 447 (6th Cir.2014); and (2) the January 2010 death of an inmate in a LaRue County, Kentucky jail where a nurse allegedly failed to refer to a doctor an inmate who *756 claimed that she was experiencing heart attack symptoms, see Jones v. SHP, No. 3:10-cv-00742 (W.D.Ky.).
These two incidents involved two different sets of medical symptoms at two different jails. Tragic as they were, these incidents did not give SHP knowledge that their employees at yet a different jail were likely to be unable to properly alert a medical director about an inmate with a suspected staph infection. After all, SHP is a large company: it employs more than 700 nurses at 198 jails in twelve states. The fact that two of SHP’s 700 nurses in two of its 198 jails housing thousands of inmates made two bad decisions regarding when to contact a medical director about alcohol withdrawal or heart attack symptoms does not translate into knowledge that, absent more rigorous training, employees at all of its jails likely would make bad judgment calls about when to contact a medical director about a suspected staph infection. “As a matter of probability, if violations were the ‘highly predictable consequence’ of a failure to train, then we would expect to see more than just one violation in hundreds or thousands of cases.” Thompson v. Connick, 578 F.3d 293, 305 (5th Cir.2009) (Clement, J., dissenting), rev’d, 563 U.S. 51, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). It does’ not detract from the tragedy of the prior events to recognize that they cannot have made SHP “deliberately indifferent” to whether all 700 of its nurses needed more training on referring suspected staph infections to a medical director.
Shadrick also relies on her expert, who concluded that SHP should have known that its business model would present unacceptable risks of harm to inmates by relying too heavily upon LPNs rather than upon more highly trained medical practitioners. But it bears emphasizing that SHP cannot be held liable under § 1983 merely for structuring or conducting its business in a negligent manner. Connick, 131 S.Ct. at 1359. In opposing SHP’s motion for summary judgment, Shadrick was required to submit evidence from which a reasonable trier of fact could find that SHP consciously chose to violate inmates’ constitutional rights. Id. at 1359-GO. On this record, a reasonable jury could not make that finding.
Finally, Shadrick asserts that SHP demonstrated deliberate indifference by ratifying its nurses’ conduct through its after-the-fact investigation. While the majority claims it does not reach this issue, it cites SHP’s investigation and failure to discipline or retrain its LPNs as proof of deliberate indifference. But Monell liability applies only where the government entity’s policy caused the deprivation of the injured party’s constitutional rights. D'Ambrosio, 747 F.3d at 388-89. Nothing SHP did after Butler died could have caused his death. SHP’s response to the death is irrelevant to the question of its deliberate indifference before the death.
It may be evident in retrospect that SHP’s employees should have handled matters much differently. However, SHP can be held liable under § 1983 only if it knew of its employees’ specific training deficits before Butler died in its care. Shadrick has not offered proof of that knowledge.. The district court properly resisted the impulse to presume foreknowledge from hindsight clarity. I would affirm summary judgment on Shadrick’s Monell claim against SHP.
II.
The majority also reverses summary judgment in favor of SHP on Shadrick’s state-law negligence claim, holding that SHP is not entitled to governmental immunity. In my view, the majority opinion overlooks Kentucky precedent affording qualified official immunity to private entities that contract with a Kentucky county *757 to provide medical services to county jail inmates. See Jerauld, 353 S.W.3d at 641. Based on Jerauld, I would affirm the district court’s ruling that SHP is entitled to qualified official immunity regarding Sha-drick’s state-law negligence claim.
Under Kentucky law, qualified official immunity is derivative of governmental (or “official”) immunity. Autry, 219 S.W.3d at 717. Governmental immunity protects a government entity where “the entity exercises a governmental function,” which is “a ‘function integral to state government.’” Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Carp., 295 S.W.3d 91, 99 (Ky.2009) (quoting Ky. Ctr. for the Arts Corp. v. Berns, 801 S.W.2d 327, 332 (Ky.1990)). Governmental immunity extends not only to the actions of the entity, but also to the official acts of the entity’s employees, agents, and alter egos. Autry, 219 S.W.3d at 717, 719.
When agents performing state functions are sued in their official capacities, they are absolutely immune from the claims. Id. at 718. When sued in their individual capacities, however, they may invoke only the doctrine of qualified official immunity, “which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.” Yanero v. Davis, 65 S.W.3d 510, 522 (Ky. 2001). Qualified official immunity is appropriate if the agent’s conduct (1) is a discretionary, rather than a ministerial act — i.e., one “involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment”; (2) is made in good faith; and (3) is within the scope of the agent’s authority. Id.
There is no dispute that, under Kentucky law, qualified official immunity extends to private medical providers who contract with government entities to provide medical care to inmates. See Jerauld, 353 S.W.3d at 641. This is so because the application of qualified official immunity does not depend upon the particular titular or employment characterization of the individual who is performing the governmental function on the government entity’s behalf, but instead “rests ... on the function performed.” Id.; see also Yanero, 65 S.W.3d at 521. In other words, the question is whether the medical provider has stepped into the shoes of the state; if it has, it is entitled to the state’s immunity protection.
In this regard, the Kentucky Court of Appeals’ decision in Jerauld is dispositive. There, the court explicitly recognized that a private psychologist was entitled to qualified official immunity, despite the fact that he was not an employee of a county jail but was simply contracted to provide medical services there. Jerauld, 353 S.W.3d at 641. The determining factor was that the psychologist — regardless of his specific employment relationship with the county— was performing a government function on the government entity’s behalf. Id.
Jerauld squarely forecloses plaintiffs claim that SHP is not entitled to qualified official immunity under Kentucky law. Jerauld holds that private entities that have contracted with a Kentucky county to provide medical services to inmates in the county jail are eligible for qualified official immunity. Id. SHP — a private entity that has contracted with a Kentucky county to provide medical services to inmates in the county jail — is therefore eligible for qualified official immunity under Kentucky law.
The majority attempts to distinguish Jerauld in two different ways. Neither is persuasive.
First, the majority asserts that immunity extends to private corporations only if they were created by the state government — which SHP clearly was not. Contrary to the position of the majority, Co- *758 mair did not erect an inflexible two-pronged test in which the threshold question is whether a private entity was created by a state agency as opposed to having been birthed in the free market. To begin with, Comair’s observation that an entity’s origins could be relevant to the immunity analysis came not in the context of a comparison between state-created entities and private entities, but between state-created entities and municipality-created entities. 295 S.W.3d at 99-100. In general, entities created by a state or county are entitled to share in the state’s sovereign immunity if they exercise a state function. However, entities created by a municipal corporation are generally not entitled to immunity because Kentucky state sovereign immunity does not extend to local municipalities. Id.; see id. at 94-95. See also Coppage Constr. Co. v. Sanitation Dist. No. 1, 459 S.W.3d 855, 860 (Ky.2015) (“Comair set forth the aforementioned analytical framework that focuses on whether the entity in question was created by the state or a county, as opposed to a city, and then whether the functions the entity performs are integral to state government.” (emphasis added)). Under Comair, “the origins of the entity” may figure into the analysis only because the etiology of the entity might answer whether the function that it performs implicates state-level concerns as opposed to merely local ones. Comair, 295 S.W.3d at 99; see also Coppage Constr. Co., 459 S.W.3d at 861-62. But if the source and nature of the function is otherwise clear — because, for example, the private entity has contracted with the state or county to perform one of its quintessentially governmental functions — there is no need to retrace the entity’s genesis. That explains why — in a decision post-dating Comair — the court in Jerauld found no need to interrogate the particular corporate form under which the psychologist was providing services to the prison; it was enough that he had contracted to perform a state — rather than a local — function. 353 S.W.3d at 641.
In addition, it strains credulity to assert that Comair constructed a new, inflexible, two-pronged official-immunity test when much of its analysis is dedicated to rejecting the court’s previous two-pronged official-immunity test as “overly simple, failing to allow for subtlety, and too limiting.” Comair, 295 S.W.3d at 99 (limiting Berns, 801 S.W.2d at 332). In fact, Comair explicitly disclaimed any assertion that it was imposing a bright-line test, noting that the question of official immunity must instead be resolved on a “case by case analysis.” Id. According to the court, an inquiry into “the origins of the entity” claiming immunity should not be “reduce[d] ... to a simple test” but should instead “be treated as a guiding principle.” Id.
The recent decision from the Kentucky Court of Appeals in Kentucky River does not suggest otherwise. See Ky. River Foothills Dev. Council, Inc. v. Phirman, No.2013-CA-001858-MR, — S.W.3d -, 2015 WL 1746483 (Ky.Ct.App. Apr.17, 2015). In Kentucky River, the court grappled with whether private organizations that merely received grants from the state were entitled to qualified official immunity. The court reasoned that they were not, observing that they had not been created by the state and that “[a] line must be drawn somewhere before the concept of governmental immunity is expanded far beyond any reasonable parameter.” Id. at *9.
SHP’s circumstances are, of course, not those of an entity that simply receives a governmental grant. Grants to private organizations are typically used to encourage private actors to engage in conduct the state deems beneficial for the general citizenry; grants are not ordinarily used to outsource a government’s own core functions. Kentucky River therefore *759 speaks only to situations where a grant is used to incentivize private entities to perform conduct “traditionally associated with government,” such as furthering beneficial progress in “poverty, education, housing, medical research, or other similar concerns.” Id. It does not control cases like this one, where the conduct outsourced to the private sector — providing medical care for inmates — is not merely something that traditionally the state has encouraged but is something that traditionally the state alone has performed. The best way to understand Kentucky River, in other words, is as creating another distinction based upon the function performed. If the private entity is pursuing ends that are simply consonant with the state’s interests, then it is not eligible for qualified official immunity, regardless of its source of funding. See Coppage Constr. Co., 459 S.W.3d at 862 (“[N]ot every ‘public purpose’ qualifies as an ‘integral state function.’ ”). But if the private entity’s activity actually supplants the state’s performance of an activity traditionally within the state’s bailiwick — such as running a prison — then the doctrine is available to the private entity that is performing the traditional state function on the state’s behalf. See id. at 864 (listing, as examples of “traditional and necessary state function[s],” “those functions performed by the state police, our public schools, the corrections system, and public highways and airways.” (emphasis added)).
To the extent Kentucky River characterized Comair as providing for a two-part test, we are constrained to follow precedent from the Supreme Court of Kentucky where it diverges from that of the lower courts. Compare Kentucky River, — S.W.3d at -, 2015 WL 1746483, at *6 (“The test for whether an entity qualifies for governmental immunity is two-pronged.”) with Comair, 295 S.W.3d at 99 (the inquiry into “the origins of the entity” claiming immunity should not be “reduced] ... to a simple test”). See also Furtula v. Univ. of Ky., 438 S.W.3d 303, 305 n. 1 (Ky.2014) (suggesting that Comair was most focused on the performance of a government function).
The majority also attempts to distinguish Jerauld by asserting that Kentucky extends doctrine of qualified official immunity to individuals only, not to corporations. Again, Jerauld the unequivocally holds that qualified official immunity extends to a private medical provider if he contracts as an individual to provide medical services to a county jail. See Jerauld, 353 S.W.3d at 641. Yet, under the majority’s view of Kentucky law, qualified official immunity would not extend to the same medical provider if he provided identical services but chose to organize his business as a limited liability corporation instead of a limited liability partnership.
The flaw with this position is that Kentucky has never held that the form of a defendant’s business is a determinative factor for qualified official immunity purposes. Jerauld gives no hint that the defendant’s business form was relevant to the defense; in fact, it explicitly reiterated that formalities such as the “status” of an agent were irrelevant to the issue and that the crucial inquiry centered upon “the function performed.” Id. And Kentucky courts have repeatedly rejected the notion that a private entity performing a governmental function is not entitled to qualified official immunity merely because it is a private corporation taking on the performance of a state function by contract. See Bryant v. Pulaski Cty. Det. Ctr., 330 S.W.3d 461, 465 (Ky.2011); Autry, 219 S.W.3d at 719; Yanero, 65 S.W.3d at 529-30: In the same vein, the majority’s assertion that SHP’s status as an independent contractor matters to the question of qualified official immunity cannot be reconciled *760 with Kentucky’s repeated admonition that application of qualified official immunity “rests not on the status or title of the officer or employee, but on the function performed.” Jerauld, 353 S.W.3d at 641. “[Statements by the entity [seeldng immunity],” whether made in a contract or otherwise, “are not controlling.” Comair, 295 S.W.3d at 102.
To reach its conclusion, the majority finds it necessary to downplay portions of Supreme Court of Kentucky decisions as dicta and as “incorrect[ ]” in order to reconcile them with its preferred interpretation of decisions from the Kentucky Court of Appeals. But a far simpler way to resolve the purported conflict is to recognize there is none. The individual-corporation binary the majority posits in this context is illusory. The majority appears to conflate the concepts of “individual capacity,” “individual persons,” and “natural (as opposed to corporate) persons.” In any event, Kentucky qualified official immunity does not depend upon the distinctions of corporate form or the specifics of corporate genealogy. The “important aspect” of the official-immunity analysis, as Comair emphasized, is the- entity’s function, not its status nor its origin. Comair, 295 S.W.3d at 99.
That determination resolves Shadrick’s negligence claim against SHP. There is no dispute that SHP, despite its designation as an independent contractor, is providing a paradigmatic government function— namely, providing medical care to incarcerated individuals. SHP has stepped into the county’s shoes to perform that function, and to the extent that its conduct is in good-faith, discretionary furtherance of that function, it is entitled to qualified official immunity. See Yanero, 65 S.W.3d at 530. Nor is there any question that SHP meets the remainder of the qualified official immunity elements. See id. at 522. Shadrick does not argue that SHP exceeded its authority or acted in bad faith, and there is no merit to the claim that SHP’s promulgation of policies for how to best implement its dictate from the county is a ministerial rather than a discretionary act. See Williams v. Ky. Dep’t of Educ., 113 S.W.3d 145, 150 (Ky.2003) (“Promulgation of rules is a discretionary function.”); Yanero, 65 S.W.3d at 529 (same). Accordingly, the district court correctly ruled that SHP was entitled to qualified official immunity under Kentucky law.
III.
For these reasons, I respectfully dissent. I would affirm the district court’s judgment.

. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).